IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

ASH GROVE CEMENT COMPANY,     )
    )
    Plaintiff,     )
    )
    v.     )    Case No. 05-2339-JWL
    )
EMPLOYERS INSURANCE OF WAUSAU,     )
    )
    Defendant.     )
    )
_____)

## MEMORANDUM AND ORDER

In this diversity action, plaintiff Ash Grove Cement Company (Ash Grove) seeks to recover under an insurance policy issued by defendant Employers Insurance of Wausau (Wausau). The matter comes before the court on four separate motions by Wausau for summary judgment (Doc. ## 114, 118, 120, 122) and Ash Grove's motion for partial summary judgment (Doc. # 115). For the reasons set forth below, Wausau's motions are denied, and Ash Grove's motion is granted in part and denied in part.

I.    **Background**

Ash Grove operates a cement manufacturing plant located in Chanute, Kansas. Wausau issued a policy insuring Ash Grove's buildings, equipment, and business income at the plant. The policy insured "against all risks of direct physical loss or damage" to the insured property, subject to various exclusions, including the following:

Cost of making good faulty or defective workmanship or material, but this exclusion shall not apply to physical damage resulting from such faulty or defective workmanship or material.

. . .

Loss of damage [sic] occasioned directly or indirectly by electrical currents artificially generated unless loss by fire or explosion not excluded in this policy ensues and then [Wausau] shall be liable for only such ensuing loss.

. . .

Loss or damage caused by: . . . Latent defect, failure, breakdown or derangement of machines or machinery, inherent vice, wear and tear, marring, scratching, chipping, breakage, gradual deterioration, insect, vermin, dampness or dryness of atmosphere, changes in temperature, rust or corrosion, unless loss by a peril not excluded in this policy ensues, and then [Wausau] shall be liable for only such ensuing loss.

The policy also contained the following notice provision:

Whenever the insured has information from which the insured may reasonably conclude that a loss has occurred which might result in payment under terms of this policy, notice shall be sent to [Wausau] as soon as practicable upon knowledge of an executive officer, insurance manager or other designated department head, provided however, that failure to give notice of any such loss which at the time of its happening did not appear to involve this policy, but which at a later date would appear to give rise to a claim hereunder, shall not prejudice such claim.

In 2001, Ash Grove discovered that the protective paint coating on the interior surfaces of a baghouse at the plant had suffered damages, including blistering, cracking and bubbling. On October 26, 2001, Ash Grove first gave notice to Wausau of a potential claim under the policy. Wausau eventually denied the claim. Ash Grove now seeks to recover $1,565, 911.26 under the policy for its damages relating to the baghouse coating, as well as attorney fees and expenses pursuant to Kan. Stat. Ann. § 40-256.

2

The parties espouse two differing theories regarding the cause of the damage to the baghouse coating.  Ash Grove alleges that on September 10, 2001, an employee cut a cable connected to a control panel for various equipment; that the cutting caused a short circuit in the cable's wires; that the short circuit caused some of the equipment to shut down, including equipment that cooled gases entering the baghouse in the cement manufacturing process; that the kiln ID fan did not shut down with the other equipment and continued to operate for several minutes; that the continued operation of the ID fan and the shutdown of the other equipment caused the temperature of gases on their way to the baghouse to rise to over 900 degrees Fahrenheit; that this high temperature excursion caused temperatures in the baghouse to exceed the 600-degree specified limit for the baghouse coating; and that the coating consequently suffered damage.

Wausau alleges that the baghouse coating was applied too thick, in excess of specifications, and that the coating therefore failed after it was cured by exposure to normal high temperatures after operations in the baghouse began in 2001.  Wausau therefore alleges that the damage to the coating was not caused by the high temperature excursion experienced on September 10, 2001.  Wausau further asserts that, because the damage resulted from the misapplication of the coating, recovery by Ash Grove is precluded by the defective workmanship exclusion in the policy.


**II.    Summary Judgment Standards**

Summary judgment is appropriate if the moving party demonstrates that there is "no

3

genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In applying this standard, the Court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Burke v. Utah Transit Auth. & Local 382*, 462 F.3d 1253, 1258 (10th Cir. 2006). An issue of fact is "genuine" if "the evidence allows a reasonable jury to resolve the issue either way." *Haynes v. Level 3 Communications, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006). A fact is "material" when "it is essential to the proper disposition of the claim." *Id.*

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Id.* (citing *Celotex*, 477 U.S. at 325).

If the movant carries this initial burden, the nonmovant may not simply rest upon his or her pleadings but must "bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which he or she carries the burden of proof." *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 910th Cir. 2005). To accomplish this, sufficient evidence pertinent to the material issue "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein." *Diaz v. Paul J.*

4

*Kennedy Law Firm*, 289 F.3d 671, 675 (10th Cir. 2002).

Finally, the Court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

### III.    Wausau's Motion for Summary Judgment – Causation (Doc. # 122)

Wausau argues that it is entitled to summary judgment because Ash Grove cannot provide sufficient evidence to support its theory of causation. Specifically, Wausau argues that there is no evidence that the cutting of the cable on September 10, 2001, caused the high temperature excursion that occurred in the baghouse on that date. In this regard, Wausau cites testimony by Terry Hyatt (who cut the cable) and David Martin (an Ash Grove electrical engineer who investigated the incident when it happened) that they cannot say for certain that the cable-cutting caused a short in the wires. Wausau also argues that Ash Grove cannot rely on its experts to establish such causation for the reasons set forth in Wausau's separate *Daubert* motions to exclude the experts' opinions.

The Court concludes that, even without reliance on Ash Grove's expert testimony, sufficient evidence exists to create a fact question on the issue of whether the cable-cutting caused the high temperature excursion. That evidence, viewed in the light most favorable to Ash Grove, is as follows: The cut cable was attached at one end to a motor controller device net, which controlled communications between various pieces of

equipment, and the cable contained two wires that supplied power.   After Mr. Hyatt  cut the cable, he heard over his radio that equipment was shutting down.   Equipment did in fact shut down, including equipment that would normally have cooled gases streaming to the baghouse.   This sequence of events provides sufficient evidence from which a reasonable jury could conclude that the cutting of the cable caused the equipment shutdown, even if the exact cause (e.g., a short circuit) is not proven to a certainty.

Further evidence reveals that a kiln ID fan did not shut down with the other equipment, but instead had to be manually shut down in the field.   The configuration of the entire system confirmed this fact—although most of the equipment was set to shut down in the event of a problem such as a short, it was discovered that the ID fan was set not to shut down upon loss of communication.   With the cooling equipment shut down but the ID fan operating, the temperatures would be expected to rise within the system.   Moreover, the gases would then bypass the operation's raw mill stage, which ordinarily would have provided additional cooling, and proceed directly from a particular tower outlet to the baghouse inlet.   Data from September 10, 2001, show that the temperature of the gases leaving the tower did rise very high, in excess of 900 degrees, and that the temperature of the gases at the baghouse inlet exceeded that guage's maximum reading of 500 degrees for a period of 17 minutes.   Accordingly, there is sufficient evidence from which a reasonable jury could infer that the cable-cutting on September 10, 2001, caused the high temperature excursion in the baghouse that immediately followed.

Wausau's sole argument in response to this evidence is to suggest that the mere

6

temporal proximity between the cable-cutting and the excursion is not enough to establish causation.   Wausau provides no authority in support of that suggestion, however.   In fact, the immediacy with which the shutdown followed the cable-cutting, together with the actual way in which the system was designed and operated, provide sufficient evidence to raise a question of fact for the jury on this issue of causation.   Accordingly, Wausau is not entitled to summary on this basis, and its motion is denied.[1]

### IV.   Wausau's Motion for Summary Judgment – Construction Defect Exclusion (Doc. # 114)

As a separate basis for summary judgment, Wausau argues that coverage is excluded as a matter of law pursuant to the policy's exclusion for workmanship defects.   Wausau points to the undisputed fact that the baghouse coating was applied too thick in places, in excess of the specifications for the coating.   Wausau cites evidence that such coating could blister or crack or otherwise fail if applied too thick, and that inspections of the baghouse revealed that the coating was damaged only in places where applied improperly. Wausau also notes that Ash Grove first blamed the company responsible for the installation of the coating for its loss.   Based on these facts, Wausau argues that the misapplication of the coating caused the damage, and as such, coverage is excluded.

_____

[1]In addition, Wausau has failed to explain why coverage would be excluded if the loss was caused by a high temperature excursion that did not result from the cable-cutting. That failure would appear to appear to preclude summary judgment for an additional reason.

Again, the Court concludes that this issue of causation presents a fact question for the jury, even without reliance on Ash Grove's experts, who relate the damage to the baghouse coating to the high temperature excursion occurring on September 10, 2001. No damage was apparent prior to the startup of operations in the baghouse in 2001. The raw temperature data and the absence of cooling mechanisms between one tower outlet and the baghouse inlet support a reasonable inference that temperatures in the baghouse exceeded the maximum specifications for the coating, beyond which damage could occur. Damage did in fact occur. Most significantly, an expert retained by Wausau (who was later replaced) opined that the excessive heat experienced in the baghouse may have contributed to the damage. Accordingly, a reasonable jury could conclude that the high temperature excursion was a cause of damage to the baghouse coating.

Wausau argues that the misapplication of the coating is undisputed. That fact and the workmanship exclusion do not necessarily operate to preclude coverage, however. Under the concurrent cause doctrine, coverage is permitted when concurrent covered and excluded causes combine to produce damage, as long as the covered cause is independent and does not fall within the relevant exclusion. *See Newton v. Nicholas*, 20 Kan. App. 2d 335, 341-44, 887 P.2d 1158, 1163-64 (1995); *Estate of Pennington v. Wolfe*, 262 F. Supp. 2d 1264, 1258-62 (D. Kan. 2003) (following *Newton* and applying concurrent cause doctrine).[2]   In this case, even if the misapplication of the coating was a cause of the

---

[2]The Court will apply Kansas law in this diversity action because the policy appears
(continued...)

damage and such a cause would ordinarily be excluded from coverage under the applicable policy, a fact question remains concerning whether the high temperature excursion in the baghouse was also a contributing cause, as Ash Grove contends, and whether the loss is therefore covered under the policy. Simply put, Wausau has not shown that the misapplication was the sole cause of the damage as a matter of law. Accordingly, summary judgment in favor on Wausau on this basis is not warranted.[3]

## V. Wausau's Motion for Summary Judgment – Lack of Expert Testimony (Doc. # 120)

By separate motion, Wausau argues that because Ash Grove's experts should not be permitted to testify regarding causation (pursuant to Wausau's *Daubert* motions), Ash Grove cannot satisfy its prima facie requirement to produce evidence that the cable-cutting caused the high temperature excursion and the excursion caused the damage. Wausau has not attempt to undertake any analysis of Ash Grove's non-expert evidence in this motion,

---

[2](...continued)
to have been issued in Kansas and because both parties have applied Kansas law in their briefs. *See Fidelity & Dep. Co. v. Hartford Cas. Ins. Co.*, 189 F. Supp. 2d 1212, 1215 n.1 (D. Kan. 2002) (citing *Simms v. Metropolitan Life Ins. Co.*, 9 Kan. App. 2d 640, 685 P.2d 321, 324 (1984)); *see also Park Univ. Enters. v. American Cas. Co. of Reading, Pa.*, 442 F.3d 1239, 1244 (10th Cir. 2006) (citing *Safeco Ins. Co. of Am. v. Allen*, 262 Kan. 811, 941 P.2d 1365, 1372 (1997)).

[3]Based on its position that the misapplication of the coating caused the damage, Wausau also argues that the loss is not covered because it was not "fortuitous". As set forth below, there is no such fortuity requirement applicable here under Kansas law. *See infra* Part VII.E. Even if there were such a requirement, however, the existence of a fact question concerning causation would also preclude summary judgment in favor on Wausau on this basis.

however.   The Court concludes that, for the reasons set forth above with respect to Wausau's other motions, sufficient evidence has been presented on the issue of causation, even without consideration of the opinions of Ash Grove's experts.   This motion is therefore denied.

**VI.      Wausau's Motion for Summary Judgment – Late Notice (Doc. # 118)**

Wausau also seeks summary judgment based on its defense that coverage is precluded by Ash Grove's late notice to Wausau of a claim under the policy.   In its own summary judgment motion (Doc. # 115), Ash Grove has also moved for summary judgment on this defense.   The Court concludes, however, that fact questions remain on the defense of late notice, and both parties are therefore denied summary judgment on that defense.

The policy here required notice of a potential claim "as soon as practicable".   Under Kansas law, such a provision requires notice within a reasonable time in view of all relevant facts and circumstances.   *Cessna Aircraft Co. v. Hartford Acc. & Indem. Co.*, 900 F. Supp. 1489, 1515 (D. Kan. 1995) (citing Kansas cases).   "As a general rule, the issue of late notice involves a question of fact." *Id.*

In support of this defense, Wausau notes that although Ash Grove claims that the damage occurred on September 10, 2001, Ash Grove did not give notice to Wausau until October 26, 2001.   Ash Grove responds that it took time to investigate the cause of the damage, that it did not delay, and that it did in fact give notice as soon as practicable.   The

Court concludes that the issue whether Ash Grove's notice was timely under the policy involves a question of fact for the jury.

To prevail on this defense, Wausau must also show actual prejudice as a result of untimely notice. *See id.* (citing *Home Life Ins. Co. v. Clay*, 11 Kan. App. 2d 280, 286-87, 719 P.2d 756, 762-63 (1986)). "Prejudice is not presumed and the burden is on the insurer to show that the prejudice is substantial." *Id.* (citing cases). "The question of prejudice arising from failure to provide timely notice is generally a question of fact." *F.D.I.C. v. Oldenburg*, 34 F.3d 1529, 1547 (10th Cir. 1994); *accord Cessna*, 900 F. Supp. at 1515-16.

Ash Grove argues that Wausau cannot establish prejudice as a matter of law based on the language in the notice provision stating that "failure to give notice of any such loss which at the time of its happening did not appear to involve this policy, but which at a later date would appear to give rise to a claim hereunder, shall not prejudice such claim." This language does not constitute an express waiver by Wausau of its right to show prejudice, however. The prejudice requirement arises only in the event that notice is found to have been untimely. The quoted proviso, plainly read, relates more to the issue of timeliness—that is, if the loss did not appear to involve the policy, notice that is not immediate will not necessarily be considered untimely. Under Ash Grove's interpretation, notice could never be considered too late, and Wausau could never pursue such a defense under Kansas law—even if notice was extremely delayed and the insurer suffered severe prejudice—despite the inclusion of a late notice provision in the policy, so long as the

application of the policy was not immediately apparent.  Such an interpretation is not reasonable, and the Court concludes that Wausau is not precluded from pursuing this defense in this case by the language of the late notice provision.

Wausau argues that it suffered prejudice from the delay in notice because the cut cable was not maintained unmolested for its inspection (portions were subsequently cut from the cable for use elsewhere); the device net was not maintained in its shutdown state for inspection; inspections of the baghouse took place without its involvement; and two other high temperature excursions occurred after September 10 before notice was given.

Ash Grove responds that the cable showed no damage, so there would have been nothing for Wausau to observe in an inspection, and that the device net was not damaged and was started up again the same day.  Moreover, given the immediate failure to preserve these components, Wausau's ability to examine the components would not necessarily have been any better even if had it been given notice very soon after the September 10 excursion.  Ash Grove also notes that Wausau's eventual investigation was drawn out over many months, and that two Wausau employees responsible for handling Ash Grove's claim were not able to identify any prejudice actually suffered by Wausau.

Thus, both sides have presented evidence that, if credited, would support a jury finding in its favor on the issue of prejudice.  Accordingly, a fact question arises, and neither party is entitled to summary judgment on the issue of late notice.

**VII.**    **Ash Grove's Motion for Partial Summary Judgment (Doc. # 115)**

12

Ash Grove has moved for partial summary judgment on various defenses asserted by Wausau.  The Court addresses each such issue in turn.


A.     Exclusion for "Electrical Currents Artificially Generated"

Wausau has asserted a defense based on the policy's exclusion for "[l]oss of damage [sic] occasioned directly or indirectly by electrical currents artificially generated."  Under Kansas law, the insurer bears the burden of establishing that a policy exclusion applies, and exclusions are narrowly construed.  *Fidelity & Dep. Co. of Md. v. Hartford Cas. Ins. Co.*, 189 F. Supp. 2d 1212, 1224 (D. Kan. 2002) (citing Kansas cases).

This exclusion does not apply to Wausau's theory that the loss here was caused by the misapplication of the baghouse coating.  Ash Grove argues, in support of summary judgment on this defense, that its theory of causation—that is, the cutting of the cable resulted in a short circuit, which caused the shutdown and the high temperature excursion—also does not involve an "electrical current artificially generated" (hereinafter ECAG).  Ash Grove insists that cases applying this exclusion have involved electrical arcing, which is distinct from a mere short circuit.

The Court rejects Ash Grove's argument that a short circuit does not constitute an ECAG.  The three cases cited by Ash Grove do not limit the scope of the term ECAG to electrical arcing, and in fact two of the cases are more helpful to Wausau than to Ash Grove.  In *Continental Insurance Co. v. Arkwright Mutual Insurance Co.*, 102 F.3d 30 (1st Cir. 1996), no ECAG exclusion was actually at issue; rather, the court was required

13

to determine whether to apply a flooding or electrical disturbance deductible in a separate policy that was intended to supplement the policy containing the ECAG exclusion. *See id.* Moreover, in direct contradiction of Ash Grove's attempt to distinguish a short circuit from electrical arcing, the *Continental* court actually equated the two phenomena, describing electrical arcing as "an electrical short circuit, in lay terms". *See id.* at 31.

In the second case cited by Ash Grove, *Associated Elecrical Cooperative v. Mutual Boiler & Machinery Insurance Co.*, 492 F. Supp. 410 (W.D. Mo. 1980), an ECAG exclusion was applied where electrical arcing had occurred. *See id.* at 411-13. The exclusion was not limited to the occurrence of electrical arcing, however, and short circuits were not discussed. *See id.* Accordingly this case is not helpful to the Court's analysis.

Finally, the third case cited by Ash Grove, *Vanguard Insurance Co. v. Connett*, 270 F.2d 868 (10th Cir. 1959), actually undermines Ash Grove's position. That case, involving a Kansas insured, does not refer to electrical arcing at all. *See id.* Rather, the uncontroverted testimony was that a furnace shut-off valve had failed to function as a result of a "short" in wiring that carried a 24-volt current. *See id.* at 870. The Tenth Circuit held that such testimony was sufficient to support a jury verdict based on application of an ECAG provision. *See id.*

Accordingly, *Vanguard*, in which the Tenth Circuit held that an electrical short fell within the language of an ECAG provision, disposes of Ash Grove's argument that the ECAG exclusion in the Wausau policy should not apply to an electrical short in wires that

14

also carried a 24-volt current.    There is no basis in the language of the exclusion for the distinction urged by Ash Grove.    Ash Grove cites the following dictionary definition of "short circuit":        "An accidentally established low-resistance connection between two points in an electrical circuit."    That definition places "short circuit" within the plain meaning of "electrical current", however, as it involves the movement of electricity between two points.    Ash Grove has failed to provide any evidence that the alleged short circuit in this case did not constitute an electrical current or an ECAG (or even that it was distinct from electrical arcing).    Therefore, the Court rejects Ash Grove's argument that the alleged short circuit in this case cannot implicate the policy's ECAG exclusion.

Ash Grove also appears to argue, as a separate basis for summary judgment on this defense, that the proximate cause of the loss was not the short circuit but rather the cutting of the cable, with the short merely a "following consequence".    The Court rejects this basis for summary judgment as well.    Ash Grove has not cited any authority supporting a proximate cause requirement for application of this exclusion.    Nor has Ash Grove explained why the short circuit—which in fact occurred *more* proximally to the ultimate damage (that is, closer within the chain of events) than did the cutting of the cable—should not be considered a proximate cause.[4]

_____

[4]It is clear from Ash Grove's evidence that the shutdown is alleged to have occurred because of a short circuit sending a signal or charge back through the cable to the device net, and not merely because of a loss of power resulting from severance of the wires carrying power (as confirmed by the fact that the other end of the cable was not connected to anything).

15

Among the cases cited by Ash Grove, only the *Continental* case could relate to this argument.   In that case, flood water came into contact with electrical equipment, causing electrical arcing and subsequent damage, and the court held that the flooding, rather than the arcing, was the dominant cause of the loss.   *See Continental*, 102 F.3d at 37.   The case is easily distinguished from the present case, however.   In *Continental*, as noted above, the ECAG exclusion was not actually at issue; instead, under a different policy, very different deductibles ($75 million versus $50,000) applied depending on whether the loss was caused by flooding or by an electrical disturbance, and the court was required to decide between those two causes.   *See id.* at 32-37.   In the present case, there is no similar need to resolve whether the loss was caused by the cable-cutting or by the short circuit. Accordingly, there is no basis for dismissing the short circuit as a cause of the excursion and loss for purposes of applying the ECAG exclusion, and summary judgment is not appropriate on this basis.[5]

B.      Exclusion for "Latent Defect"

Ash Grove moves for summary judgment on Wausau's defense based on the exclusion in the policy for damage caused by "latent defect".   Wausau asserts that the exclusion applies here based on its theory that the damage was caused by the misapplication of the baghouse coating.   Ash Grove argues that this exclusion should be

_____

[5]Wausau did not move for summary judgment on the basis of this potentially-dispositive exclusion.

16

interpreted not to extend to construction or design defects (such as the misapplication of the coating), but only to inherent defects within materials; or that the exclusion is at least ambiguous in that respect. Kansas courts have not addressed this particular issue.

Under Kansas law, the construction of an insurance policy is a question of law for the court. *First Fin. Ins. Co. v. Bugg*, 265 Kan. 690, 694, 962 P.2d 515, 519 (1998)).

> Policies must be construed according to the sense and meaning of the terms used, and if the language is clear and unambiguous, it must be taken in its plain, ordinary and popular sense. Similarly, courts should not strain to create an ambiguity where, in common sense, there is none. The test to determine whether an insurance contract is ambiguous is not what the insurer intends the language to mean, but what a reasonably prudent insured would understand the language to mean.

*Id.* (citations omitted). "To be ambiguous, a contract must contain provisions of language of doubtful or conflicting meaning, as gleaned from a natural and reasonable interpretation of its language." *Brumley v. Lee*, 265 Kan. 810, 813, 963 P.2d 1224, 1226 (1998). "If the language is ambiguous, the construction most favorable to the insured must prevail." *Id.* at 812, 963 P.2d at 1226.

The Court concludes that the Kansas Supreme Court, if faced with the question, would likely reject Ash Grove's interpretation of the "latent defect" exclusion. Ash Grove relies primarily on *Mattis v. State Farm Fire and Casualty Co.*, 454 N.E.2d 1156 (Ill. Ct. App. 1983), in which the court, purporting to follow the "great majority of cases," construed a "latent defect" exclusion to include only inherent defects in the materials used in construction. *See id.* at 1162. Ash Grove also cites *Markham v. Nationwide Mutual Fire Insurance Co.*, 481 S.E.2d 349 (N.C. App. 1997). In that case, the court found the

17

exclusion to be ambiguous based solely on the lack of any further definition of "latent defect" in the policy and the split of authority. *See id.* at 356.

In the more recent case of *City of Burlington v. Hartford Steam Boiler Inspection and Insurance Co.*, 190 F. Supp. 2d 663 (D. Vt. 2002), a federal court surveyed the various cases addressing the issue, and it chose to follow the "strong trend of authority" and the "majority of courts" in finding "latent defect" unambiguously to include construction defects. *See id.* at 688-89.

The issue was analyzed at length in *Board of Education of Maine Township High School District 207 v. International Insurance Company*, 684 N.E.2d 978 (Ill. Ct. App. 1997). In that case, the insured argued in favor of the *Mattis* court's interpretation, while the insurer cited California's definition that a "latent defect" is simply "one that is not readily observable or discoverable to any but the most searching examination." *See id.* at 981-82 (citing *Scott v. Continental Ins. Co.*, 51 Cal. Rptr. 2d 566, 570-71 (Cal. Ct. App. 1996)). The *Maine Township* court noted that California and several other jurisdictions had rejected the *Mattis* approach:

> These courts have refused to employ *Mattis'* narrow definition of latent defect, reasoning in part that the *Mattis* definition does not comport with the ordinary dictionary meaning of latent defect and that it compels the result that only nondiscoverable defects are latent.

*Id.* at 982 (citing cases). The court then found that while *Mattis* had relied on federal cases from New York, Ohio, and Tennessee in choosing to follow the "great majority of cases," state courts in those jurisdictions had rejected the *Mattis* approach since that

18

decision. *See id.* (citing cases).  The court also concluded that the *Mattis* definition was in fact contrary to the dictionary definition and ordinary understanding of "latent defect" to mean simply a hidden defect not discoverable by reasonable inspection.  *See id.*  The court reasoned that nothing in the term limits it to structural defects in materials, and that "[f]aults, flaws and irregularities can be the result of design or faulty construction just as much as mere weakness of material."  *Id.* at 983 (quoting *Scott*, 51 Cal. Rptr. 2d at 573). The *Maine Township* court thus rejected the construction of its sister court in *Mattis*.

The Court agrees with and adopts the reasoning of the court in *Maine Township*. Like the strong majority of courts that have considered the issue since *Mattis*, the Court concludes that the ordinarily understood definition of "latent defect" can include defective construction, and that the exclusion is not ambiguous in this regard.  Unlike the court in *Markham*, this Court will not find an ambiguity simply because of a lack of complete unanimity among the courts.

The Court will therefore define "latent defect" to mean a hidden defect not discoverable by reasonable inspection.  Applying that definition, the Court concludes that a question of fact exists as to whether the damage to the baghouse coating was caused by a latent defect in the form of improper application of the coating.  Accordingly, summary judgment on Wausau's defense based on the "latent defect" exclusion" is denied.

### C.   Exclusion for "Inherent Vice"

Ash Grove also seeks summary judgment on Wausau's defense based on the

exclusion for damage caused by "inherent vice". Ash Grove argues that this exclusion should be limited to inherent defects in the materials used for construction (the same interpretation urged by Ash Grove for "latent defect"). Ash Grove further argues that because Wausau does not contend that the baghouse coating material was itself defective, but instead that the coating was merely applied improperly, the exclusion does not apply.

The Court agrees that summary judgment is appropriate with respect to this exclusion. First, the Court agrees with Ash Grove's interpretation of the term "inherent vice". In fact, the presence of exclusions for both "latent defect" and "inherent vice" in the policy supports construing the two terms differently, to avoid redundancy. *See Chubb Group of Ins. Cos. v. Guyuron*, 1995 WL 739618, at *5 (Ohio Ct. App. Dec. 14, 1995). The Third Circuit has applied the following definition:

> An inherent vice is defined by various courts as "any existing defects, diseases, decay or the inherent nature of the commodity which will cause it to deteriorate with a lapse of time." It is also defined "as a cause of loss not covered by the policy, does not relate to an extraneous cause but to a loss entirely from internal decomposition or some quality which brings about its own injury or destruction. The vice must be inherent in the property from which recovery is sought."

*GTE Corp. v. Allendale Mut. Ins. Co.*, 372 F.3d 598, 611 (3d Cir. 2004) (quoting *Port of Seattle v. Lexington Ins. Co.*, 48 P.3d 334, 338-39 (Wash. Ct. App. 2002)).

> In other words, the question is whether the insured property contains its own seeds of destruction or whether it was threatened by an outside natural force.

*Id.* (quoting *American Home Assur. Co. v. J.F. Shea Co.*, 445 F. Supp. 365, 368 (D.D.C. 1978)).

20

Wausau does not take issue with this definition of "inherent vice".    Nor does Wausau contend that the baghouse coating material itself contained an inherent defect. Wausau instead focuses on the coated *surfaces* of the baghouse, which it alleges contained the seeds of their own destruction in the form of excessively thick coating.

The Court must reject this tortured attempt by Wausau to fit its theory of causation within the "inherent vice" exclusion.    Under any reasonable interpretation, the damaged property in this case was the baghouse coating itself, which had to be replaced by Ash Grove.    That coating was not defective *inherently*, but was merely applied incorrectly. Thus, the coating did not carry the seeds of its own destruction; rather, the loss was allegedly caused by the extraneous force of the misapplication of the coating (and, allegedly, a high temperature excursion experienced in the baghouse).    The "inherent vice" exclusion does not apply here as a matter of law, and summary judgment is awarded to Ash Grove on this defense.


D.    Exclusion for "Changes in Temperature"

Ash Grove next seeks summary judgment on Wausau's defense based on the policy's exclusion for damage caused by "changes in temperature".    Ash Grove argues that this exclusion could reasonably be read to apply only to changes in outside temperature or the weather, as opposed to changes in an artificially-created inside temperature, and that the exclusion is therefore ambiguous.

This same issue arose recently in *Old Town Canoe Co. v. Continental Casualty*

21

*Co.*, 2005 WL 2674902 (D. Me. Oct. 20, 2005). The court in *Old Town Canoe* noted that of the several courts that had considered this exclusion, only one had failed to find the phrase "changes of temperature" to be ambiguous as it related either to inside or outside temperatures. *See id.* at *3 (citing cases). The court further noted that in the case of that single exception, the court had resolved the issue in a summary fashion, without discussing whether the phrase could be ambiguous. *See id.* at *4 (citing *Hartford Fire Ins. v. B. Barks & Sons, Inc.*, 1999 WL 341972, at *9 (E.D. Pa. May 27, 1999)). Moreover, in *Old Town Canoe*, the temperature exclusions immediately followed an exclusion for "dampness or dryness of atmosphere" in the policy at issue, and the court concluded that such a juxtaposition with that exclusion and others relating to forces of nature encouraged the impression that "temperature referred to ambient temperature, as opposed to artificially-induced inside temperature." *See id.* at *2-3. Finally, the court concluded that, from a lay perspective, an ordinary reference to the "temperature" could commonly be understood to refer to outside temperature, and it noted that the insurer could easily have eliminated any ambiguity by further definition or better drafting. *See id.* at *3. For these reasons, the court in *Old Town Canoe* followed the overwhelming weight of authority in finding the exclusion to be ambiguous and construing the exclusion in favor of the insured. *See id.* at *2-4.

Wausau argues that the reference to "changes in temperature" in the policy exclusion unambiguously includes changes in the artificially-generated temperature in the baghouse. In addition to *Hartford Fire*, which the court discussed in *Old Town Canoe*,

22

Wausau has cited only two other cases to support its position.  The first case, *Michigan Sugar Co. v. Employers Mutual Liability Insurance Co.*, 308 N.W.2d 684 (Mich. Ct. App. 1981), is clearly distinguishable, as the exclusion there applied to "change in temperature (whether or not atmospheric)."  *See id.* at 687.  Certainly, the addition of the same parenthetical to the policy in the present case would help make the exclusion unambiguous, but the case is not particularly relevant given the actual language at issue here.  The other case cited by Wausau, *American Iron & Machinery Works Co. v. Insurance Company of North America*, 375 P.2d 873 (Okla. 1962), is also inapposite; there, the damage arose from exposure to freezing outside temperatures, and thus the court did not address whether the exclusion also applied to changes in inside temperature.  *See id.* at 874.

Wausau argues that the parties would have intended to include changes in inside temperature because the policy was insuring a cement manufacturing plant that would use high temperatures.   Under Wausau's interpretation, however, the exclusion would encompass the beginning or conclusion of normal operations in the baghouse.   Regardless of the parties' actually intent (of which there is no evidence), the Court agrees with Ash Grove that the term "changes in temperature" could be understood, in the plain and ordinary sense, to refer to outside temperature and not to the artificially-created temperature within the baghouse.   Accordingly, the Court follows the overwhelming majority of courts in concluding that the exclusion is ambiguous and must therefore be construed in favor of Ash Grove.   There has been no suggestion that any change in the

weather or outside temperature played a role in the damage to the baghouse coating. Summary judgment is therefore granted in favor of Ash Grove on Wausau's defense based on the "changes in temperature" exclusion.

           E.      <u>"Fortuitous" Event</u>

Ash Grove moves for summary judgment on Wausau's defense that the loss was not "fortuitous". In support of this defense, Wausau argues that because of its misapplication, the baghouse coating was bound to fail and did fail prior to any cable-cutting, and that the loss therefore did not result from any fortuitous event.

Wausau has not cited to any authority, however, to support the position that a showing of fortuity is required in this case under Kansas law. Wausau has not identified any such express requirement in the policy at issue here, which provided coverage "against all risks of physical loss or damage to the property insured hereunder," subject to various exclusions. Wausau has cited only to cases applying the law of other states in support of an implied fortuity requirement. Indeed, the Tenth Circuit has noted (in a case involving application of Colorado law) that an implied requirement of "fortuitousness" in all-risk policies is universally recognized. *See Adams-Arapahoe Joint Sch. Dist. No. 28-J v. Continental Ins. Co.*, 891 F.2d 772, 775 (10th Cir. 1989).

No Kansas court has recognized such a requirement, however. In *Thomas v. Benchmark Insurance Co.*, 36 Kan. App. 2d 409, 140 P.2d 438 (2006), the Kansas Court of Appeals stated that "[a] basic function of insurance is that it will furnish indemnity for

unexpected or fortuitous events," but the court made that statement within the context of defining the word "accident" in a policy. *See id.* at 415, 140 P.3d at 442-43. Similarly, in *Harmon v. Safeco Insurance Company of America*, 24 Kan. App. 2d 810, 954 P.2d 7 (1998), the word "fortuitous" is found only in the court's quotation of another court's definition for the term "accidental". *See id.*

Well after the Tenth Circuit made its observation in *Adams-Arapahoe*, the Kansas Supreme Court decided *Atchison, Topeka & Santa Fe Railway Co. v. Stonewall Insurance Co.*, 275 Kan. 698, 71 P.3d 1097 (2003). In *Atchison*, the court, in rejecting a "nonfortuity" defense, described the defense in this way: "lack of fortuity being based on the term, 'accident', in a liability policy." *Id.* at 754, 71 P.3d at 1134-35. *Atchison* and its description of that defense were then cited by the Tenth Circuit in rejecting an argument that Kansas public policy prohibits coverage for non-fortuitous loss or damage. *See Park Univ. Enters. Inc. v. American Cas. Co. of Reading, Pa.*, 442 F.3d 1239, 1245-47.

Thus, under Kansas law as stated by the Kansas Supreme Court and recognized by the Tenth Circuit, a lack-of-fortuity defense applies only within the context of policy language relating to "accidents". No Kansas court has held that a fortuity requirement is implied in every insurance policy, and the Tenth Circuit has explicitly rejected such an argument under Kansas law. Wausau has not identified any specific language in the policy issued to Ash Grove that would create a fortuity requirement. Accordingly, the Court concludes that Ash Grove is not required to show that the loss was "fortuitous" in this

case, and Ash Grove is therefore entitled to summary judgment on this defense as asserted by Wausau.[6]

F.   Late Notice

Finally, Ash Grove's motion for summary judgment on Wausau's late notice defense is denied for the reasons set forth above with respect to Wausau's motion on that issue. *See supra* Part VI.

IT IS THEREFORE ORDERED BY THE COURT THAT Defendant's Motion for Summary judgment (Doc. # 114) is **denied**.

IT IS FURTHER ORDERED THAT the Motion by Defendant Employers Insurance of Wausau for Summary Judgment on the Issue of Late Notice (Doc. # 118) is **denied**.

IT IS FURTHER ORDERED THAT Defendant Employers Insurance of Wausau's Motion for Summary Judgment Based on the Lack of Expert Testimony (Doc. # 120) is

---

[6]Moreover, even if Kansas law could be read to include a fortuity requirement, Ash Grove would nonetheless be entitled to summary judgment on this defense. In *Atchison*, the Kansas Supreme Court, in rejecting a non-fortuity argument, upheld the district court's conclusion that the loss was "unexpected and unintended." *Atchison*, 275 Kan. at 754, 71 P.3d at 1135. Wausau does not dispute that the cable-cutting would consitute a fortuitous event, but it argues that failure of the baghouse coating was not fortuitous because the coating misapplication made the failure inevitable. Wausau has not explained, however, why the misapplication itself should not be considered a fortuitous event from Ash Grove's perspective. Wausau has not pointed to any evidence that the misapplication was expected or intended. Accordingly, under either party's theory of causation, the loss should be considered fortuitous as a matter of law.

**denied**.

IT IS FURTHER ORDERED THAT Wausau's Motion for Summary Judgment on the Issue of Proof of Causation (Doc. # 122) is **denied**.

IT IS FURTHER ORDERED THAT Plaintiff's Motion for Partial Summary Judgment (Doc. # 115) is **granted in part and denied in part**. The motion is granted with respect to Wausau's defenses based on policy exclusions for "changes in temperature" and "inherent vice" and on Wausau's non-fortuity defense. The motion is denied with respect to Wausau's defenses based on policy exclusions for "electrical currents artificially generated" and "latent defect" and Wausau's late notice defense.

IT IS SO ORDERED.

Dated this 3rd day of October, 2007, in Kansas City, Kansas.


s/ John W. Lungstrum
John W. Lungstrum
United States District Judge